■ JAMES JONES, Appellant, v GILBERT SHARPE, Respondent. — Appeal from an order of the Supreme Court at Special Term (Williams, J.), entered December 28, 1982 in Albany County, which granted defendant's motion for summary judgment dismissing the complaint. Plaintiff commenced the instant action on July 17, 1981 to recover damages for personal injuries he allegedly sustained as a result of an auto-truck collision that occurred on December 9, 1979. In a bill of particulars, plaintiff alleged that he suffered injuries (bruises) to various portions of his body and serious injury to his "left thigh, right knee, back and nose". At an examination before trial held on March 15, 1982, plaintiff stated that the only area of his body that still bothered him as a result of the accident was the area above his left knee. He described that injury as a "pulling, like a snapping sensation", with a "burning" and a "prickling" sensation there at times since the accident. Defendant moved for summary judgment pursuant to CPLR 3212 upon the ground that the complaint was without merit and that there were no triable issues of fact on the question of serious injury. Special Term found that plaintiff had failed to establish a prima facie case of serious injury as defined in subdivision 4 of section 671 of the Insurance Law and granted defendant's motion for summary judgment dismissing the complaint. This appeal ensued. The order entered at Special Term should be affirmed. Although the question of the existence of a "serious injury" is often left to the jury, case law has established that summary judgment dismissing a claim of "serious injury" will be granted in appropriate cases (*Simone v Streeben*, 56 AD2d 237; *Sanders v Rickard*, 51 AD2d 260). It is the function of the court in the first instance to determine whether plaintiff has established a prima facie case with respect to serious injury as defined in subdivision 4 of section 671 of the Insurance Law (*Licari v Elliott*, 57 NY2d 230; *Hezekiah v Williams*, 81 AD2d 261). In the instant case, plaintiff failed to establish by competent medical proof a "permanent loss" or "consequential limitation of use of a body organ or member". His own testimony indicates that he has not lost the use of his left leg. He began work within the next several days after the accident and missed only 10 days from work in the two and one-half year period following the collision. He works a full week plus a half day of overtime on Sundays. He performs the same work now as before the accident. Plaintiff's claim that he is unable to work overtime during the week because of his injury is not supported by medical opinion. Dr. Joseph Fay characterized the injury to his left leg only as "mild to moderate" which *may* be permanent in nature. Plaintiff's further claim of a medically determined injury and impairment of a nonpermanent nature preventing him from performing substantially all of the material acts which constitute his usual and customary daily activities for a period in excess of 90 days in the 180 days following the injury has clearly not been met. Mere allegations of limitation of body functions without medical proof are insufficient to demonstrate the existence of a genuine factual issue (*Daviero v Johnson*, 88 AD2d 732, 733). It is not enough that plaintiff suffered some injuries. He must instead demonstrate that he has suffered a "serious injury" (see *Licari v Elliott, supra,* p 238). Order affirmed, with costs. Casey, Mikoll and Yesawich, Jr., JJ., concur.

Kane, J. P., and Main, J., dissent and vote to reverse in the following memorandum by Kane, J. P. Kane, J. P. (dissenting). It is conceded that plaintiff, then 40 years of age, sustained an injury to his left knee in the

accident of December 9, 1979. As of November 30, 1982, he continued to suffer pain and a "prickling" sensation around his left knee and thigh area, which, according to the affidavit of his attending physician submitted on the motion herein, has resulted in a mild to moderate consequential limitation or impairment of his left leg and knee which may be permanent in nature. Moreover, this affidavit further stated that the injury resulted in great difficulty for plaintiff and prevented him from engaging in a number of activities. The physician also reported on nerve conduction studies made of the injured area by a neurological specialist who had concluded that plaintiff's complaints were suggestive of possible stretch injury or even neuroma of the related nerves. Plaintiff, a tractor trailer operator, described the limitations on his ability to withstand prolonged work activity, climb a ladder to repair his roof, or operate a chain saw to cut wood for his home which was heated by wood stoves. It is our view that the documentary sworn proof submitted on behalf of plaintiff on this motion is sufficient to establish, prima facie, a "serious injury" within the meaning of subdivision 4 of section 671 of the Insurance Law, and the instant motion should not have been granted (*Licari v Elliott*, 57 NY2d 230, 237; *Simone v Streeben*, 56 AD2d 237; *Sanders v Rickard*, 51 AD2d 260). The order should be reversed, the motion for summary judgment denied, and a trial should be directed to determine the issue of fact raised by plaintiff's prima facie proof of serious injury.

■ JOHN GRACE & COMPANY, INC., Respondent, v STATE UNIVERSITY CONSTRUCTION FUND, Defendant and Third-Party Plaintiff-Appellant. MARVIN A. MASS et al., Individually and Doing Business as COSENTI ASSOCIATES, Third-Party Defendants-Appellants. (And a Fourth-Party Action.) — Appeals from a judgment of the Supreme Court in favor of plaintiff, entered February 28, 1983 in Albany County, upon a decision of the court at Trial Term (Conway, J.), without a jury. Defendant contends that the trial court erred in finding defendant liable to plaintiff for the cost of certain repair work done by plaintiff on three different types of heat exchangers, which plaintiff had previously installed at the State University of New York at Stony Brook. The third-party defendant maintains that the trial court erred in imposing liability over against it on defendant's third-party claim. We find ample evidence in the record to support the trial court's findings and, therefore, affirm the judgment. Pursuant to a contract with defendant, entered into in the fall of 1973, plaintiff agreed to install a high temperature hot water distribution system at the Stony Brook campus. The third-party defendant (engineer), primarily a firm of mechanical engineers, was engaged by plaintiff to provide the professional services necessary to complete the design and construction of the project. The system required three types of heat exchangers, which used high temperature hot water produced by a centralized boiler, to generate steam, hot water for heating purposes and hot water for domestic needs. The engineer's design manual originally specified that the heat exchangers be manufactured by Aerco or an approved equivalent, but at defendant's request, two other manufacturers were specified as acceptable, including Taylor, from which plaintiff ultimately obtained the equipment. After plaintiff accepted Taylor's bid on the heat exchangers, Taylor submitted shop drawings of the equipment, which the engineer disapproved, and revised shop drawings were thereafter submitted and approved by the engineer. Plaintiff installed the sealed units as they were delivered to the job site by Taylor. Defendant accepted the completed work in January, 1976, and shortly thereafter directed plaintiff to repair all of the Taylor units, a substantial number of which had developed leaks. Plaintiff did so and commenced the instant action when defendant refused to pay for the repairs. Defendant impleaded the engineer. Based upon the testimony of

plaintiff's expert, the trial court found that the sole proximate cause of the leaks in the Taylor units was the use of "non-compatible metals" for the internal parts. Plaintiff's expert explained that the use of unprotected dissimilar metals resulted in a galvanic corrosion mechanism that virtually guaranteed leakage. He further opined that the selection of such materials was "a design failure" and was "strongly in violation of good practice". Contrary to defendant's argument, the trial court's conclusion which relieved plaintiff of any responsibility for the leakage was not against the weight of the evidence. As noted above, the manufacturer with which plaintiff dealt was one of those specifically approved by the engineer, and the manufacturer's shop drawings were ultimately approved by the engineer. When delivered to the job site, the units were sealed, and there is evidence in the record that the manufacturer's warranty* would have been voided if the sealed units had been opened. In any event, there is no evidence that a general contractor, engaged to install such equipment, could or should have discovered that a corrosion problem was inevitable merely by inspecting the internal parts. Indeed, the record shows that the galvanic corrosion mechanism was a design defect, which was outside plaintiff's contractual responsibility and expertise. Nor is there any evidence that plaintiff damaged the units during installation or otherwise improperly installed them. Based upon all the evidence in the record, the trial court could reasonably find that plaintiff constructed the system in accordance with the design provided by the engineer, as required by its contract with defendant, and that plaintiff installed the equipment specified in the design. Under such circumstances, the trial court could also reasonably find that plaintiff was not liable to defendant when the system failed to work properly (see *MacKnight Flintic Stone Co. v Mayor of City of N. Y.*, 160 NY 72). Defendant also contends on this appeal that plaintiff was required to make the disputed repairs at its own expense pursuant to a contractual guarantee, but this claim was not pleaded in the answer as an affirmative defense and, therefore, was waived (CPLR 3018, subd [b]; see *De Lisa v Amica Mut. Ins. Co.*, 59 AD2d 380, 382, affd 43 NY2d 648). In any event, the contractual guarantee did not apply to design defects. Turning to the engineer's liability on defendant's third-party claim, the engineer contends that since its specifications did not provide for the method of connecting the copper-nickel coils with the risers in the heat exchangers, where the leaks occurred, it was the obligation of the manufacturer to select the proper fittings and, therefore, plaintiff, not the engineer, should be responsible for the subcontractor's failure to perform. The engineer also contends that there is no expert proof showing that it failed to comply with the appropriate standard of competent practice. We find that the proof in the record supports the trial court's imposition of liability over against the engineer. Testimony in the record establishes that the design and construction of high temperature hot water systems require a high degree of expertise in order to avoid malfunctions and other complications. Defendant engaged the engineer to provide this expertise. In its contract with defendant, the engineer agreed to "provide complete professional services necessary to complete the design and construction of the project", including the preparation of outline specifications describing the performance criteria and materials of various components and the inspection of contractors' shop drawings. In view of the testimony of plaintiff's expert that the use of unprotected dissimilar metals for the internal components of the heat exchangers, which he described as a "design failure" that was "strongly in violation of good practice", would inevitably cause corrosion problems due to galvanic action, the engineer's

---

\* The manufacturer, Taylor, was impleaded as a fourth-party defendant by the engineer, which obtained a judgment by default on its fourth-party complaint. Taylor apparently went out of business shortly after the Stony Brook project was completed.

failure to specify that dissimilar metals not be used could readily be viewed as a breach of its contractual obligation and a failure to exercise the required degree of skill. More importantly, the engineer ultimately approved the manufacturer's shop drawings, pursuant to which the heat exchangers were fabricated. While the shop drawings apparently did not reveal the material of the particular components that failed, they did show that dissimilar metals were to be used for other components, and the engineer communicated with the manufacturer concerning internal components before approving the shop drawings. The trial court could reasonably have concluded that in approving a design which led to the introduction of dissimilar metals, the engineer, according to plaintiff's expert, deviated from good practice. Finally, there was some testimony from the engineer's own expert concerning the need to inquire into the qualifications of a manufacturer before specifying it for the purposes of establishing a standard of quality. The engineer undertook no such inquiry before acceding to defendant's suggestion and including Taylor in the design manual. In our view, there is sufficient evidence in the record to support the trial court's finding of liability over against the third-party defendant engineer. The judgment should be affirmed. Judgment affirmed, with one bill of costs against defendant and third-party defendant. Mahoney, P. J., Casey and Weiss, JJ., concur.

Mikoll and Levine, JJ., concur in part and dissent in part in the following memorandum by Levine, J. Levine, J. (concurring in part and dissenting in part). We respectfully disagree with that part of the majority's decision which upholds the imposition of liability over against the third-party defendant (engineer). In our view, recovery by defendant State University Construction Fund against the engineer must fail because of the absence of the requisite expert testimony that anything it did or failed to do constituted malpractice, i.e., violated accepted standards of architectural practice (see *530 East 89 Corp. v Unger,* 43 NY2d 776, 777). It is undisputed that the engineer's plans and specifications did not direct the use of the unprotected dissimilar metals as internal components of the heat exchangers, the cause ascribed by plaintiff's expert for the leaks in those units. Thus, the "design defect" that was alluded to by plaintiff's expert was not the work product of the engineer, but of the manufacturer. Moreover, since it is equally uncontested that the manufacturer's shop drawings which were submitted to the engineer for approval did not contain any indication that the juxtaposition of these metals was contemplated, the engineer was never put on actual notice of that design defect. It seems necessarily to follow, then, that the "violation of good practice" described by plaintiff's expert can only refer to the manufacturer's design and not to the engineer's design, nor to the engineer's conscious disregard of the manufacturer's design. The majority essentially concedes that malpractice cannot be posited here on the engineer's specifying the use of the improper metal components and that the manufacturer's shop drawings did not explicitly disclose that they were to be used. Instead, the majority relies on three alternative theories of negligence on the part of the engineer, namely, (1) the engineer's failure expressly to direct in the plans and specifications that dissimilar metals were *not* to be used; (2) the engineer's approval of the manufacturer's shop drawings (even though, as the majority states, they "apparently did not reveal the material of the particular components that failed" (majority, p 862), because the shop drawings "did show that dissimilar metals were to be used for *other* components, and the engineer communicated with the manufacturer concerning internal components" (*id.;* emphasis added); and (3) the engineer's failure to inquire into the manufacturer's qualifications "before acceding to defendant's suggestion and including Taylor in the design manual" (p 862). As to the first two of the foregoing rationales for

upholding recovery over against the engineer, it is readily apparent that both are based upon breaches of a standard of professional care different from what plaintiff's expert referred to as a violation of good practice, namely, that the engineer *should have* anticipated or suspected the manufacturer's use of the dissimilar metals, either in the first instance, or after the shop drawings disclosed that "dissimilar metals were to be used for other components". Certainly, it does not necessarily follow that it was also a "violation of good practice" for the engineer not to have anticipated or suspected the manufacturer's "violation of good practice". Without expert opinion *specifically* directed to the engineer's failure to anticipate or suspect the manufacturer's improper use of the two metals, either initially or after seeing its shop drawings, no liability against the engineer may be imposed on the basis of those failures (*530 East 89 Corp. v Unger, supra; Pipe Welding Supply Co. v Haskell, Conner & Frost,* 96 AD2d 29). There was a similar fatal absence of expert testimony on the third of the majority's grounds for imposing malpractice liability, i.e., the engineer's failure to make inquiry as to the qualifications of the manufacturer. The trial court's finding of fact and conclusions of law do not at all refer to any such failure of the engineer to make inquiry. It based liability solely on the engineer's "negligence in the approval of the design and specifications of the Taylor heat exchangers". Moreover, adoption of this failure to inquire theory of the engineer's liability would have required further evidence and findings on whether such an inquiry would have disclosed the manufacturer's incompetence, whether the failure to inquire was a proximate cause of the damages and whether an apportionment of damages should have been made on the basis of the contributing negligence of defendant State University Construction Fund in requesting that the engineer include that particular manufacturer in the design manual. Finally, if we are correct that liability on the basis of malpractice must fail because of the lack of appropriately specific expert testimony, the majority's suggestion that liability may be based upon the engineer's breach of its contract to "provide complete professional services necessary to complete the design and construction of the project" must also be rejected. Such an agreement by the engineer did not constitute an express special promise to accomplish some definite result, which is necessary in order to sustain a claim of breach of contract for the rendition of professional services (*Delaney v Krafte,* 98 AD2d 128; *Mitchell v Spataro,* 89 AD2d 599; *Monroe v Long Is. Coll. Hosp.,* 84 AD2d 576). Accordingly, we would modify the judgment by reversing so much thereof as imposed liability in favor of defendant State University Construction Fund against the engineer.