BOARD OF EDUCATION OF THE HUDSON CITY SCHOOL DISTRICT, Appellant-Respondent, v SARGENT, WEBSTER, CRENSHAW & FOLLEY, Defendant and Third-Party Plaintiff-Respondent-Appellant. THOMPSON CONSTRUCTION CORPORATION, Third-Party Defendant-Respondent.

Third Department, April 6, 1989

## APPEARANCES OF COUNSEL

*Rapport, Meyers, Griffen & Whitbeck (Victor M. Meyers* of counsel), for appellant-respondent.

*Donohue, Sabo, Varley & Armstrong, P. C. (Kenneth G. Varley* of counsel), for defendant and third-party plaintiff-respondent-appellant.

*Couch, White, Brenner, Howard & Feigenbaum (Sharon Couch DeBonis* of counsel), for third-party defendant-respondent.

## OPINION OF THE COURT

LEVINE, J.

In 1966, plaintiff, the Board of Education of the Hudson City School District (hereinafter the School District), entered into an agreement with defendant, Sargent, Webster, Crenshaw & Folley (hereinafter the Architect), on a standard form of agreement of the American Institute of Architects (hereinafter AIA) for the provision of plans and specifications and supervi-

sory architectural services in connection with the construction of a new high school building. Under paragraph 7 (b) of the agreement, the Architect was obligated to make periodic visits to the work site "to determine in general if the work is proceeding in accordance with the Contract Documents". The Architect was also required to "keep [the School District] informed of the progress of the work, will endeavor to guard [it] against defects and deficiencies * * * and * * * may condemn work as failing to conform to the Contract Documents". The Architect was also to issue certificates of payment, thereby representing that the work was properly performed and authorizing progress and final payments by the School District to the general contractor. Paragraph 7 (b) provided, however, that the Architect was not required to make "exhaustive or continuous on-site inspections to check the quality or quantity of the work and * * * will not be responsible for the Contractors' failure to carry out the construction work in accordance with the Contract Documents". The agreement also required the Architect to assemble any written guarantees required of contractors and to make three annual inspections of the building following completion of construction and to advise the School District of any maintenance and remedial measures required.

Third-party defendant, Thompson Construction Corporation (hereinafter Thompson), was engaged as general contractor and construction commenced in the spring of 1969. Thompson contracted with Skyway Roofing Company, Inc. (hereinafter Skyway) to install the roof on the building. The specifications called for a four-ply, built-up, gravel-surfaced roof consisting of four layers of felt and coal tar pitch to assure bonding and waterproofing, with the gravel embedded in the top level of pitch. These layers were to be applied on top of a poured gypsum roof deck. The School District submitted evidence that, for a roof of this type, the layers as applied must be protected from exposure to precipitation during construction, since moisture trapped within the layers has a tendency to vaporize and expand, creating blisters in the plies of felt which may crack and cause leakages. Therefore, the specifications expressly required completion of the application of the plies of roofing in one day or, failing that, the application of a glaze coating of hot bitumen to protect the felts until application of the gravel.

The School District also proved that Skyway failed to comply with the foregoing specifications in that application of the

layers was done in phases, leaving the felt plies exposed to rain and snow without protective glazing. In fact, Thompson's daily construction reports indicated that Skyway personnel shoveled snow off the partially completed roof and that this was observed by one of the Architect's representatives on the site. The Architect then engaged an outside roofing expert to inspect Skyway's installation. He concluded that the roof system was seriously out of conformity with the specifications, alluding to the phased construction but, more importantly, to another defect, i.e., the fact that the vapor barrier was not attached to the poured gypsum deck. Based upon that report, the Architect directed Thompson to remove and replace the defective roofing. Thompson refused, insisting that the roof was properly applied. Following various conferences and exchanges of correspondence, the Architect agreed to several less severe remedial measures and, once these were completed, issued certificates of payment for the roofing.

The construction of the high school was completed and a final certificate of payment was issued by the Architect in September 1972. It was much later discovered, however, that the Architect had failed to obtain the two roofing guarantees required by the specifications, i.e., a two-year guarantee from Thompson and Skyway and a manufacturer's 20-year roofing bond. Leaks in the roof developed as early as November or December 1972. Upon initially consulting the Architect about the leaks, the School District's building and grounds superintendent was told by the Architect's representative that the cause of the problem was ice buildup. Each succeeding year, the blistering and the leaks became worse and, by 1979, the School District contemplated replacement of the roof. At this point, it was informed by the Architect that the cause of the problem was the phased installation in violation of the specifications and that the guarantees required by the contract inadvertently had not been obtained.

The School District then brought the instant suit against the Architect and Thompson. Its complaint set forth five causes of action against the Architect, the first two of which were for breach of contract, alleging in the first the Architect's failure to obtain the roofing guarantees and, in the second, the Architect's failure to have informed the School District of the deviation from the specifications in the roof installation and failure to have guarded the School District against the general contractor's defective performance and to have condemned the work as failing to conform to the con-

tract documents. The Architect cross-claimed against Thompson for contribution and indemnity. Subsequently, the School District's action against Thompson was dismissed on Statute of Limitations grounds and Supreme Court also dismissed the Architect's cross claim against Thompson, without prejudice to the commencement of a third-party action. These rulings were affirmed by this court (Board of Educ. v Thompson Constr. Corp., 111 AD2d 497). On another appeal, the Architect's causes of action against Thompson for contribution and indemnification were dismissed with leave to replead the claim for indemnification (Board of Educ. v Sargent, Webster, Crenshaw & Folley, 125 AD2d 27, affd 71 NY2d 21). The Architect served such an amended pleading.

In the foregoing procedural posture, the case proceeded to trial. At the conclusion of all of the evidence, Supreme Court granted the Architect's motion for a directed verdict dismissing all but the first of the School District's causes of action. The court directed a verdict in favor of the School District on its first cause of action (the failure to obtain the roofing guarantees) and assessed damages against the Architect for $6,000, the penal sum of the roofing bond called for by the contract. Finally, the court dismissed the Architect's third-party complaint against Thompson, ruling that the evidence did not establish the Architect's claim for indemnification. These cross appeals ensued.

■ In our view, the School District's proof regarding its second cause of action was sufficient to withstand the motion for a directed verdict. Hence, the portion of the judgment dismissing the second cause of action should be reversed, that claim reinstated and remitted for retrial. Supreme Court's contrary ruling was based upon the provision of paragraph 7 (b) of the agreement under which the Architect was absolved from responsibility "for the Contractors' failure to carry out the construction work in accordance with the Contract Documents", reading that provision as totally exonerating the Architect from liability for construction defects. While this very clause in the standard AIA architect/owner contract has been given exculpatory effect in this State and other jurisdictions (see, Jewish Bd. of Guardians v Grumman Allied Indus., 96 AD2d 465, 467, affd 62 NY2d 684; Shepard v City of Palatka, 414 So 2d 1077 [Fla]; Moundsview Ind. School Dist. No. 621 v Buetow & Assocs., 253 NW2d 836 [Minn]), none of the cases involved defects known by the architect during the course of construction, which he failed to apprise the owner of

under the contractual duty to "keep the [School District] informed of the progress of the work". We decline to extend the application of the clause in question to an instance such as this, where the trier of facts could find that the architect was aware of the defect and failed to notify the owner of it.

First, in general, exculpatory provisions are disfavored and are narrowly construed (see, Gross v Sweet, 49 NY2d 102, 106-107). Second, the underlying rationale for exonerating an architect under the exculpatory clause does not apply to defects known by the architect. The cases reason that an owner who has not contracted and paid for an architect to closely supervise construction should not be able to hold the architect liable for those defects in the contractor's performance which close supervision would have revealed (see, Jewish Bd. of Guardians v Grumman Allied Indus., supra, at 465; Moundsview Ind. School Dist. No. 621 v Buetow & Assocs., supra, at 839). Clearly, however, the School District did bargain and agree to pay the Architect for periodic inspection and conveyance of information on the progress of the contractor's performance which the Architect acquired as the result of such on-site visits. When, as a result of periodic inspection, an architect discovers defects in the progress of the work which the owner, if notified, could have taken steps to ameliorate, the imposition of liability upon the architect for failure to notify would be based on a breach of his own contractual duty, and not as a guarantor of the contractor's performance (see, Hunt v Ellisor & Tanner, 739 SW2d 933, 937 [Tex]).

We are not persuaded by the Architect's rejoinder that, even if the exculpatory clause does not apply, the obligation to notify the School District of the defective roof installation was satisfied by its sending to Frederick Chalkraft, whom the School District appointed as project representative, or Clerk of the Works, copies of several items of correspondence between the Architect and Thompson during the spring of 1970 concerning the roof construction problem and the remedies agreed upon. There was no evidence submitted that a responsible officer of the school district or member of its board was made aware of this correspondence received by Chalkraft. The issue thus presented is whether the Architect established as a matter of law on the motion for a directed verdict the existence of an agent/principal relationship between Chalkraft and the School District such that the School District is charged with constructive notice of the information the Architect imparted to Chalkraft (see, Becker v Manufacturers Trust

*Co.,* 262 App Div 525, 527; 3 NY Jur 2d, Agency and Independent Contractors, § 259, at 81).

The Architect contends that this basis for imputing Chalkraft's knowledge to the School District was established by documentary evidence that he was appointed project representative on the project by the School District and it paid his salary as such. In our view, this factor is not conclusive on the issue. First, the record is subject to conflicting inferences as to whether, despite the formal employment of Chalkraft by the School District, he was actually performing the role of agent for the Architect. The standard AIA owner/architect and owner/contractor agreements prepared by the Architect here and used on this project contain language suggesting that a project representative acts on behalf and at the direction of the architect in overseeing the work. Also, there was evidence that Chalkraft's function on the project was defined by an AIA document entitled "Suggested Instructions to Full-Time Project Representative" furnished by the Architect. These instructions also can readily be interpreted as imposing upon Chalkraft the duty to report information to the Architect rather than to the School District. Further, there was testimony that other School District personnel who visited the construction site were told by one of the Architect's representatives not to communicate with Chalkraft, "who was overseeing the project for the Architect". The School District's Superintendent also testified that neither he nor the Board of Education ever received reports from Chalkraft during the entire course of construction.

Even if Chalkraft is deemed to have been an agent of the School District, it could be inferred that he had no duty to report as important a matter as the defective roof to the School District, knowing that it was being handled directly by the Architect *(see, Corrigan v Bobbs-Merrill Co.,* 228 NY 58, 68-69). Moreover, it could be found that the Architect was well aware that the practice of all the parties was for Chalkraft not to report such matters to the School District, in which case no knowledge of Chalkraft may be imputed to the School District *(see, Smith v Hancock Mut. Life Ins. Co.,* 260 App Div 990). Lastly, the evidence could also support a finding that Chalkraft acted as agent of both the Architect and the School District. "[W]hen an agent undertakes to act in a transaction for two parties whose interests are or can become adverse, as a reasonable man might foresee, knowledge of facts arising from the transaction is not deemed the knowledge of the

principal to operate as a waiver or to work otherwise to his detriment, unless the principal has actual and not merely constructive knowledge of the true facts" *(Otsego Aviation Serv. v Glens Falls Ins. Co.,* 277 App Div 612, 618 [Bergan, J.]; *see, Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31, 43-44).

■ Alternatively, the Architect argued before Supreme Court and urges now that the School District's second cause of action failed because of the absence of expert testimony that the Architect's performance fell short of accepted professional standards of architectural practice. Such a deviation by an architect may, it is true, afford the basis of a contract cause of action as well as recovery in tort *(Sears, Roebuck & Co. v Enco Assocs.,* 43 NY2d 389, 396). At the least, however, the claim in the second cause of action based upon the Architect's failure to notify of the known defective roof installation asserts the breach of a specific contractual undertaking by the Architect, akin to the failure to achieve a particular promised result, which does not require proof of a failure to meet professional standards of care *(see, Sears, Roebuck & Co. v Enco Assocs., supra; Robins v Finestone,* 308 NY 543, 547; *Salzman v Rosell,* 129 AD2d 833, 835; *cf., Grace & Co. v State Univ. Constr. Fund,* 99 AD2d 860, 863 [dissenting opn], *mod on dissenting opn below* 64 NY2d 709).

■ We also reject the Architect's contention that the School District's proof of damages, i.e., the 1972 costs to correct by replacement of the defectively installed roof, was improper as a measure of damages. The cost to correct and replace defective construction may be a proper measure of damages for a breach of contract by an architect *(Sears, Roebuck & Co. v Enco Assocs., supra; Hubert v Aitken,* 2 NYS 711, 713, *order adhered to on rearg* 5 NYS 839, *affd* 123 NY 655; *Schwartz v Kuhn,* 71 Misc 149, 151; 5 Am Jur 2d, Architects, § 24, at 687-688). The testimony of the School District's roofing expert was sufficient to prima facie establish its damages on the foregoing theory.

■ The School District also urges that Supreme Court erred in dismissing its fraud causes of action. In these claims, the School District essentially alleged that the Architect, in issuing the final certificate of payment in September 1972, knowingly or recklessly falsely misrepresented that Thompson had properly performed the work and had furnished the roof guarantees required by the contract, and fraudulently concealed the contractor's nonperformance in these respects.

However, we agree with Supreme Court's conclusion that the School District's fraud causes of action failed because of the absence of proof of the element of scienter, i.e., an intent to deceive *(see,* Prosser and Keeton, Torts § 107, at 741 [5th ed]). While knowledge of falsity or reckless pretense of knowledge may establish scienter *(National Conversion Corp. v Cedar Bldg. Corp.,* 23 NY2d 621, 626), there was far from clear and convincing evidence that, in certifying to the satisfactory completion of the work, the Architect had anything but a genuine belief that the remedial measures it ordered were sufficient. Nor, in light of the ordering of remedial measures and the changes in the Architect's supervisory personnel, was there the clear and convincing evidence of the deceptive purpose required to establish fraudulent concealment *(see, Simcuski v Saeli,* 44 NY2d 442, 452). To the extent that the relationship between the School District and the Architect created a duty on the latter's part sufficiently independent of the contract to give rise to an action in tort for the breach thereof *(see, Rich v New York Cent. & Hudson Riv. R. R. Co.,* 87 NY 382, 397-398; *Charles v Onondaga Community Coll.,* 69 AD2d 144, 146-147, *appeal dismissed* 48 NY2d 650), this would only make the Architect liable for negligent misrepresentation or concealment *(see, White v Guarente,* 43 NY2d 356, 361-362; *Ultramares Corp. v Touche,* 255 NY 170, 186-187, 189; Restatement [Second] of Torts § 551 [1977]). Here, however, expert testimony would have been necessary to establish the Architect's negligence, and its absence justified dismissal of these causes of action *(see, 530 E. 89 Corp. v Unger,* 43 NY2d 776, 777-778).

██ ██ The remaining issues do not require extended discussion. On the cross appeal by the Architect, the damages awarded the School District on its first cause of action in the amount of the penal sum of the roofing bond, i.e., what the School District would have recovered from the manufacturer had the Architect performed its obligation to obtain that guarantee, properly compensated for an economic loss which was a direct, foreseeable consequence of the breach *(Kenford Co. v County of Erie,* 108 AD2d 132, 135, *affd* 67 NY2d 257). Nor did Supreme Court err in dismissing the Architect's third-party claim for indemnification against Thompson. There was no contractual right to be indemnified. As our prior discussion indicates, the liability if any of the Architect is not vicarious, purely based on Thompson's breach, but for the Architect's failure to perform its own contractual obligations. Hence,

common-law indemnification does not lie *(see, McDermott v City of New York,* 50 NY2d 211, 217-218).

WEISS, J. P., MIKOLL, YESAWICH, JR., and HARVEY, JJ., concur.

Judgment modified, on the law, without costs, by reversing so much thereof as dismissed plaintiff's second cause of action; said cause of action reinstated and matter remitted to the Supreme Court for a new trial thereon; and, as so modified, affirmed.