**Wilfred R. CARON, Plaintiff,**

v.

**THE TRAVELERS PROPERTY AND CASUALTY CORP., Defendant.**

**No. 96 Civ. 6236(DC).**

United States District Court, S.D. New York.

Sept. 30, 1999.

Gage & Pavlis, New York, NY, for Plaintiffs: by: Alfred U. Pavlis, David G. Rizzo.

McDermott, Will & Emery, New York, NY, for Defendant; by: Joel E. Cohen, Terri L. Ross.

## MEMORANDUM DECISION

CHIN, District Judge.

In this case, plaintiff Wilfred R. Caron, an attorney, contends that defendant The Travelers Property and Casualty Corporation ("Travelers") fraudulently induced him to leave a job at the Department of Justice ("DOJ") for a position at Travelers. The claim of fraud is based on alleged misrepresentations and omissions made to Caron by his friend of more than forty years, Samuel F. Simone.

In 1989, when Caron became dissatisfied with his job at DOJ, he considered giving up the practice of law to become a monk. Instead, he embarked on a massive search to find a new job. When his efforts were wholly unsuccessful, he turned to Simone, who was then an attorney employed by Travelers. Simone was able to obtain a job for Caron at Travelers.

After approximately a year, however, Caron's employment with Travelers was terminated. He was unsuccessful in his efforts to find new employment. He then commenced this action, alleging that Travelers—and in particular his friend Simone—had fraudulently induced him to leave DOJ.

The case was tried to a jury. The jury found that Travelers had defrauded Caron and awarded him $250,000 in damages.

Travelers moves for judgment as a matter of law dismissing the amended complaint, or, alternatively, for a new trial. Caron moves for prejudgment interest.

Travelers's motion for judgment as a matter of law is granted, for no reasonable jury could have found, by clear and con-

vincing evidence, that Simone and Travelers acted with the intent to defraud Caron. Rather, to the contrary, a reasonable jury could have only concluded that Simone acted not to deceive or hurt Caron, but rather, to help him. Indeed, the evidence showed that Simone had known Caron for more than forty years, that they had gone to high school, college, and law school together (for at least part of the time), that Simone had introduced Caron to his wife and was in Caron's wedding party, and that Simone bent over backwards to help a friend who was in need find a job. In addition, a reasonable jury could only have concluded that Caron, a sophisticated, experienced, and intelligent attorney who had practiced law for decades, could not have reasonably relied on Travelers's alleged misrepresentations and omissions. To the contrary, it was clear that Caron was anxious to leave his job at DOJ, that he had made extensive, unsuccessful efforts to find new employment, and that he would have accepted the position at Travelers in any event. Accordingly, the amended complaint is dismissed.

Caron's motion for prejudgment interest is denied as moot.

### SUMMARY OF THE CASE

The following facts are drawn from Caron's trial testimony or are otherwise undisputed, and all conflicts in the evidence have been resolved in his favor:

Caron is an experienced trial and appellate lawyer who has been practicing law for more than forty years. He held various jobs in both the private and public sectors, and in 1987 he became a limited partner in a Washington, D.C. law firm.

By March 1988, he was asked to leave because he was not "sufficiently profitable for the firm." (Tr. 46). He remained at the firm for several more months. He eventually obtained a position with the Office of Legal Policy at DOJ as senior counsel, starting in October 1988. He had not received any other job offers when he accepted the DOJ position.

Caron soon became dissatisfied with his job at DOJ. He attempted to obtain a different position within DOJ, but was unsuccessful. He then took an extended unpaid leave of absence, from September 1989 to mid-April 1990, during which he considered, among other things, giving up the practice of law and becoming a monk. He decided against that option after spending four weeks in a monastery and instead embarked on an extensive job search, applying for a wide range of legal and non-legal jobs in the private and public sectors all over the country. He sent out more than eighty resumes and applied for such jobs as law school dean, Chief of Drug Policy for the City of Memphis, general counsel for an association, director of compliance for a securities brokerage firm, legal trainer for a law firm, and other law firm positions. He responded to advertisements and also sent unsolicited letters to law firms and recruiting firms. He did not, however, receive one job offer.

On January 22, 1990, Caron telephoned Simone, who was then serving as the managing partner of Travelers's White Plains staff law office ("SLO").[1] Caron and Simone had attended high school together, as well as two years of college and part of law school. Until the instant lawsuit, they

---

1. Travelers maintains a number of SLOs throughout the country. These are "law firms" that perform legal work only for Travelers and its insureds. The SLOs perform trial work as well as appellate work. The SLOs are set-up to look like law firms, with law firm names, but their employees are employees of Travelers and their only clients are Travelers and its insureds. The Claims Department of Travelers sends cases (*e.g.*, personal injury cases) to the SLOs, and the SLOs represent the insureds, at Travelers's expense. The SLOs maintain time records and "paper bills" are sent to the Claims Department for budgetary purposes. Sometimes the Claims Department send a case to a private outside law firm (referred to as "panel counsel") instead of to an SLO, and panel counsel send an actual bill to Travelers. In essence, then, each SLO competes for Travelers cases with other SLOs as well as panel counsel.

had been members of a group of friends that had remained in touch for more than forty years. In fact, Caron met his wife through Simone and Simone was in Caron's wedding party.

Caron understood that Simone was in charge of what was, "in essence, ... a negligence office for Travelers in White Plains." (Tr. 221). Caron called Simone to seek his help in finding a job, and Simone arranged an interview for Caron with Travelers's New York City SLO. Simone did so to help a friend, and Caron conceded at trial that he "doubted" that there was "anything in it" for Simone when Simone arranged the interview. (Tr. 222–23). Caron went to the interview with the understanding that he would be interviewing not for a position as head of a centralized appeals office for Travelers, but as an attorney doing appeals within the New York City SLO. Caron was advised at the interview, however, that there was no position available for him in the New York City SLO. Caron testified that he would have accepted the position had it been offered to him. (Tr. 223–25).

The next day, Caron met with Simone and "pitched" the idea that Travelers consolidate all of its New York appellate work in a single office and hire Caron to run the office. At the time, Travelers was not looking for an appellate lawyer, had not advertised for one, had not contemplated consolidating its appellate work in one office, and had not been seeking to recruit Caron away from DOJ. (Tr. 230–31). Simone told Caron that he would take up Caron's proposal with his superiors at Travelers. To assist Simone, Caron drafted a two-page letter, dated April 10, 1990, setting forth the benefits of consolidating Travelers's appellate work. (PX 8). He later supplemented the letter with an addendum. (PX 8). Neither document reflected any understanding by Caron that Travelers would require SLOs to send their appeals to a central appeals office.

Simone raised the idea of an appeals project with Oliver Dickins, who was then head of the staff counsel operations for Travelers. Dickins told Simone that the project sounded like a good idea, as long as it was cost-effective. Dickins asked Simone to check with the managers of other SLOs. Simone did so, and he reported to Caron that all but one of the SLO managers were "supportive" or "positive." (Tr. 67, 231–33, 337).

In May 1990, Simone called Caron and informed him that if Caron were hired, he would have to start out as an appellate lawyer in Simone's SLO, an arrangement that, as Caron testified, "didn't particularly disturb [him.]" (Tr. 72). Caron and Simone met, at Simone's mother's house over a spaghetti dinner, to discuss the matter, and Caron's only real concern was that he not be required routinely to do "the usual work of a trial [lawyer] doing defense work for insurance companies." (Tr. 73). Caron asked Simone about job security and Simone told him that as long as his performance was good, there should not be a problem.

Caron completed and signed an employment application, in which he acknowledged that "[e]mployment at The Travelers is for no fixed period of time and may be terminated by [him] or The Travelers at any time, with or without cause, and with or without advance notice." (DX 125). Caron was aware that if he were hired he would be an at-will employee and he understood what that meant.

Following the May 1990 meeting, Simone and Caron spoke several times. Simone told Caron that his annual salary would have to be under $75,000 so that the approval of anyone above Dickins would not be required. Simone and Caron also met on August 18, 1990. Caron did not raise the issue of how appeals would be referred to him. He and Simone did discuss salary, vacation benefits, how long Caron was expected to remain a part of the White Plains SLO, and what his duties would be in that office. Simone told Caron that the "plan" was to establish a separate

appellate office within six months, in part because Simone wanted to get Caron "off" his budget as soon as a central appeals office could be established. (Tr. 79, 236).

In mid-September 1990, Dickins approved the hiring of an attorney assigned to Simone's SLO in White Plains, who would be on Simone's budget. Simone called Caron to tell him the project had been "approved" and that Caron "was hired to head it up." (Tr. 83–84). Caron and Simone had virtually no other discussion about specifics, and, as Caron conceded at trial, the subject of whether or how Travelers would direct appeals to him was never discussed prior to his hire. (Tr. 235–36). Travelers did not disclose to Caron that he would have to try to "market" himself to obtain cases, nor, on the other hand, did Travelers represent that he would not have to do so. Caron was told by Travelers and understood that a decision had been made to centralize appeals in a central appellate office. (Tr. 105–06).

Simone's practice was not to send offer letters to new employees. Caron insisted on one, however, and he drafted an offer letter for himself, *i.e.*, for Simone to send to him. (PX 13). The letter he drafted provided that he would be handling appeals "assigned by Travelers to this firm [the White Plains SLO] *and* other firms, with a view to developing a centralized, state-wide appellate capability for Travelers here in White Plains." (PX 13) (emphasis added). Simone made some changes to the letter and sent it back to Caron. The revised, final letter provided:

> Your primary responsibility will be to handle all appeals in cases assigned to our firm *from* the New York offices of The Travelers with a view to developing a centralized, state-wide appellate capability for The Travelers in White Plains. To the extent consistent with your appellate responsibilities, I may assign you additional responsibilities to (1) provide advice and argue motions concerning novel or difficult issues of law, and (2)

> assume discreet [sic] responsibilities at the trial level in the firm's cases. Your responsibilities will not include the trial of cases or primary responsibility for cases at the trial level. However, on occasion, you may be asked to assist with court or deposition appearances in emergencies.

(PX 14) (emphasis added). Caron signed and returned it, without making any further changes.

Travelers had been experiencing financial difficulties as early as the start of 1990. The caseloads for the SLOs had begun to decline and concerns were raised about the size of SLO staffing. Travelers was considering downsizing. None of these facts were disclosed to Caron before he accepted his position with Travelers.

Caron resigned from DOJ, and began working for Travelers on November 19, 1990. Soon thereafter, he wrote several memoranda to Dickins regarding the appeals project. These memoranda do not reflect any belief on the part of Caron that Travelers had committed to directing appeals to him or to establishing a centralized appeals office by any specific date. (PX 17, 18, 20).

In the ensuing months, it became clear that Caron would have to work to get appeals, that he would have to, in essence, "sell" his concept of a centralized appeals office to the other SLOs. Caron complained to Simone that this had not been "the deal," that he had thought the work was going to be "directed" to him. (Tr. 370–71).

Eventually, concerns were raised within Travelers as to whether Caron's position was cost-effective. Simone advised Caron of these concerns and let Caron draft a memorandum, for Simone's signature, urging that Caron's position be continued. (PX 31A). Simone made a few minor revisions and sent the memorandum to the Claims Department litigation manager who had raised the concerns. When Simone implemented staff reductions in

1991, he retained Caron over employees with more seniority, over the objection of others at Travelers. (Tr. 427). At some point, Simone tried to help Caron find another position within Travelers.

In December 1991, Travelers advised Caron that his position would be eliminated; his last day of employment was February 3, 1992. (Tr. 124).

Caron looked for a new job for approximately a year and a half; he met with some sixty people; and he wrote 150–300 letters. He was unable, however, to find new employment; as he put it, he "had absolutely no luck." (Tr. 125).

Caron filed this diversity case on August 16, 1996, alleging fraudulent inducement and seeking compensatory and punitive damages. After the close of discovery, Travelers moved for summary judgment dismissing the complaint and I denied the motion. *Caron v. The Travelers Corp.*, No. 96 Civ. 6236(DC), 1998 WL 395319 (S.D.N.Y. July 15, 1998).

Caron argues that Travelers defrauded him by making material misrepresentations and omitting material information. Specifically, Caron contends that: (1) Travelers misrepresented to him that it had approved an "appeals project" that involved the consolidation of all of Travelers's appeals in a separate, centralized appellate office; (2) Travelers failed to disclose that it had not made a decision to consolidate and centralize its appellate litigation in a separate appeals office; (3) Travelers failed to disclose to Caron that his employment was part of a test project and that he would have to solicit work from other SLOs and the Claims Department; (4) Travelers failed to disclose the

role of the Claims Department; and (5) Travelers failed to disclose that it was experiencing financial difficulties.

The case was tried to a jury on December 14–18, 1998. At the close of Caron's case, Travelers moved for judgment as a matter of law. I granted the motion with respect to Caron's claim for punitive damages and otherwise reserved decision. The jury returned a verdict on December 18, 1998 in favor of plaintiff. The jury found that Travelers had "fraudulently induced" Caron to leave his position with DOJ to accept the position with Travelers. The jury awarded Caron damages of $250,-000 for economic loss and zero damages for noneconomic loss.

These motions followed.

## DISCUSSION

### A. Applicable Legal Standards

#### 1. Rule 50 Motions

A motion pursuant to Fed.R.Civ.P. 50 for judgment as a matter of law "may be granted only 'when[,] "drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [the non-movant], a reasonable jury could only have found for the [movant].' " *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir.1999) (quoting *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir.1996) (quoting *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir.1995))); *see also Stratton v. Department for the Aging*, 132 F.3d 869, 878 (2d Cir.1997).[2]

#### 2. Fraud

■ Under New York law, a plaintiff alleging fraud must prove, by clear and

---

**2.** As a threshold matter, Caron contends that Travelers's Rule 50 motion is "fatally flawed" because (a) a Rule 50 motion may not be "renewed" after trial unless the motion was made before the case was submitted to the jury, (b) a Rule 50 motion must specify the law and the facts on which the moving party claims it is entitled to judgment, and (c) Travelers moved for a directed verdict at the close of Caron's case "without further comment."

(Pl. Mem. at 2–3) (citing Tr. 545). The contention is rejected. When Travelers moved for a "directed verdict," I reserved decision and specifically deferred argument. (Tr. 545). After the jury was excused, we did discuss the issues in more detail. (Tr. 549–58). Moreover, the issues had been fully briefed in Travelers's summary judgment motion, and Caron was fully on notice as to the bases for Travelers's Rule 50 motion.

convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, (4) reasonable reliance on the part of the plaintiff, and (5) injury to plaintiff. *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *see generally Stewart v. Jackson & Nash,* 976 F.2d 86 (2d Cir.1992) (holding that attorney stated a claim for fraud when she was induced, by alleged misrepresentations of fact, to leave employment with prior law firm to join defendant law firm).

On this motion, two elements are of principal concern: intent to defraud and reasonable reliance.

 To prove intent to defraud, or scienter, a plaintiff must prove " 'a reckless indifference to error,' 'a pretense of exact knowledge,' or ·(an) assertion of a false material fact "susceptible of accurate knowledge" but stated to be true on the personal knowledge of the representer.' " *Slotkin v. Citizens Casualty Co.,* 614 F.2d 301, 314 (2d Cir.1979) (quoting and citing New York cases). To succeed on a claim for fraudulent omission, a plaintiff must show by clear and convincing evidence that the defendant was "more than negligent in [its] failure to disclose material facts." *Allen v. Westpoint–Pepperell, Inc.,* 11 F.Supp.2d 277, 288 (S.D.N.Y.1997); *accord Corcoran v. New York Power Auth.,* No. 95 Civ. 5357(DLC), 1997 WL 603739, at *8 (S.D.N.Y. Sept. 29, 1997) (to prove fraud, plaintiff had to show "a willful intent to harm" plaintiff); *Board of Educ. v. Sargent, Webster, Crenshaw & Folley,* 146 A.D.2d 190, 539 N.Y.S.2d 814, 820 (3d Dep't 1989) (to establish fraudulent concealment, there must be clear and convincing evidence of "deceptive purpose"); *Caban v. Gottlieb Iron Works,* 147 Misc.2d 583, 558 N.Y.S.2d 810, 813 (N.Y.Sup.1990) (plaintiff must prove "intent to deceive or harm" plaintiff).

The issue of reasonable reliance is a "nettlesome" one. *Schlaifer Nance,* 119 F.3d at 98. The relative sophistication of the parties is an important consideration. *See id.* ("The parties involved in this litigation are not widows or orphans."). In addition, if the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80–81 (2d Cir.1980).

### B. *Application*

For purposes of this motion, I assume that Caron proved the first, second, and fifth elements of his fraud claim. I hold, however, that a reasonable jury could only have found that Caron had failed to prove, by clear and convincing evidence, the third and fourth elements—intent to ·defraud and reasonable reliance.

#### 1. *Intent to Defraud*

 Although I held, in denying Travelers's summary judgment motion, that a genuine question of fact existed as to the issue of fraudulent intent, on the record presented at trial, I now conclude otherwise. The jury's finding in this case that Travelers—acting primarily through Simone—intended to defraud Caron was not reasonable and must have been the result of sheer surmise and speculation.

The undisputed facts showed that Travelers was not in the market for an appellate attorney, that it was not seeking to recruit Caron, and that it was not considering consolidating appeals or creating a centralized appeals office. Caron initiated the contact with Travelers, calling on his friend of more than forty years for help after he had been unsuccessful in his other efforts to find another job. Caron—not Travelers—conceived of, and developed, the idea of a centralized appeals office.

Travelers had no motive to defraud Caron. Travelers had no reason to "lure" Caron away from DOJ. The SLOs were in

the business primarily of defending negligence suits, and Travelers had no great need for a centralized appellate office or an appeals specialist.

The incontrovertible evidence showed that Simone had nothing to gain from "luring" Caron into joining Travelers. Instead, the evidence showed that Simone was merely trying to help a friend. There was no intent on Simone's part to deceive or harm Caron. In fact, Simone bent over backwards to help Caron. Simone arranged for Caron to interview with the New York City SLO. When that did not work, Simone pitched an idea to his supervisors at Caron's request, using materials that Caron had drafted. When Simone was unable to obtain approval for a centralized appeals office right away, he arranged to hire Caron for his own office, the White Plains SLO, even though there was no assurance of additional cases and Caron's addition increased Simone's "costs." Simone let Caron draft his own offer letter, even though it was not Simone's practice to send offer letters. After Caron was hired and there was pressure to reduce costs, Simone retained Caron over more senior employees and later tried to help Caron find another position within Travelers. On these undisputed facts, no reasonable juror could have concluded that Simone was seeking to deceive or harm Caron.

Scienter can also be proven by recklessness, and assuming, as I do, that Simone made false material misrepresentations and omissions, I nonetheless conclude that no reasonable jury could have found that Simone acted recklessly. At worst, he was trying too hard to help a friend who was in need, and, as a consequence, he represented that there was more support for the project than there actually was. But there is nothing to suggest that he acted with "reckless indifference to error" or that he pretended to have knowledge that he did not have. Rather, he presented the memoranda that Caron had drafted for him to his supervisors, he spoke to Dickins, and

he spoke to the managers of the other SLOs. He told Caron that the "project" had been approved and that the "plan" was to have Caron work in the White Plains SLO for approximately six months until the central office could be started. In view of the indications of "approval" that he did have and the fact that he was given permission to hire Caron, and given his desire to help a friend, no reasonable juror could find that Simone acted with "reckless indifference" to Caron.

Caron argues that Simone was motivated to induce Caron to join Travelers to help improve Simone's own standing within Travelers. The evidence, however, did not show this to be the case, and certainly not clearly or convincingly. If anything, the addition of Caron to his staff increased Simone's "costs" without any concrete economic benefit, as the cases that were to be referred to Caron were to remain part of the inventory of the other SLOs for purposes of budgeting "credit." (Tr. 79, 81–82, 340, 401).

In sum, no reasonable jury could have found that Simone and Travelers made the alleged misrepresentations and omissions with the fraudulent intent to defraud or harm Caron.

### 2. *Reasonable Reliance*

■ Even assuming a reasonable jury could have found intent to defraud by clear and convincing evidence, Travelers is still entitled to judgment as a matter of law on the issue of reasonable reliance. No reasonable jury could have found that Caron was induced by Simone's alleged misrepresentations and omissions to leave DOJ for Travelers.

First, the record demonstrates that Caron was ready to leave DOJ anyway. He was not satisfied with his job at DOJ, to the point where he took a leave of absence to live in a monastery for four weeks to explore the possibility of becoming a monk. He took a seven-month leave of absence during which he applied for dozens of jobs

all over the country. Despite sending out some eighty resumes, he did not receive a single offer. He also testified that he would have accepted the first position that he had interviewed for at Travelers (in the New York City SLO) if it had been offered to him, and that position did not involve him heading up a central appeals office. (Tr. 223–25). On these undisputed facts, no reasonable jury could have concluded that Caron would have turned down the Travelers offer even if he had known that the appeals project, as he envisioned it, had not been fully approved, that he would have to make an effort to obtain cases from the Claims Department and other SLOs, and that Travelers was experiencing financial difficulties. He was still being offered a job at close to the salary he had been making at DOJ, as special appellate counsel in his friend's "law firm."

Second, Caron was an experienced, intelligent attorney, with a high level of sophistication in legal matters. Even if he actually believed that he would not have to do any "marketing" or "selling" of himself to obtain cases to handle, that belief was not reasonable and, at minimum, it should have caused Caron to inquire. Caron knew that he was starting in Simone's SLO and he knew, or should have known, that the SLOs competed with each other as well as with outside "panel counsel" for business. If he did not know, he should have asked, given the unusual structure of the SLOs at Travelers—law firms that only handle Travelers business and that compete with each other and panel counsel to get cases from the Claims Department.

Third, the offer letter—which was principally drafted by Caron himself—and the terms of the offer certainly should have put Caron on notice that the "appeals project" as he purportedly envisioned it had not been approved. The letter provided that he would be handling appeals "assigned" to the White Plains SLO "from" the other SLOs, with a *"view* to developing a centralized, state-wide appellate capability." (Emphasis added). This language certainly should have put him on notice that the "plan" for a centralized appeals office had not been etched in stone. To the contrary, Caron was put on notice that appeals had to be "assigned" to him and that Travelers had not committed to creating a central appeals office, within six months or otherwise. Certainly, Caron should have inquired if these matters were important to him. Indeed, while it is true that Travelers did not disclose to Caron that he would have to "market" himself, it is also undisputed that Travelers never represented that he would not have to do so.

Fourth, as a sophisticated, experienced attorney who had held numerous jobs in different business settings over his forty-plus year career, Caron should have known that plans could change and that corporations could experience financial difficulties and engage in downsizing. Caron certainly could have done some due diligence on Travelers's financial condition[3] and he certainly could have sought written commitments with respect to the appeals project. He did neither. To the contrary, he understood that he was an at-will employee and that the terms and conditions of his employment could be altered at any time. Even assuming that he actually believed that corporate approval had been given for the project, it was not reasonable for him to believe that Travelers was making any commitment that could not be changed.

In short, no reasonable jury could have found that Caron had proven, by clear and convincing evidence, reasonable reliance on the alleged misrepresentations and omissions.

### CONCLUSION

Travelers's motion for judgment as a matter of law is granted and the amended

---

**3.** Caron testified that he did not ask a single question about or conduct any research on the financial condition of Travelers, a public corporation. (Tr. 256).

complaint is dismissed with prejudice and without costs or attorneys' fees. Caron's motion for prejudgment interest is denied as moot.

SO ORDERED.