SCHLAIFER NANCE & COMPANY, Plaintiff–Appellant,

v.

The ESTATE OF ANDY WARHOL, Frederick Hughes, Edward W. Hayes, Esq., and Vincent Fremont, Defendants–Appellees.

No. 811, Docket 96–7740.

United States Court of Appeals, Second Circuit.

Argued March 31, 1997.

Decided July 10, 1997.

James C. Rawls, Powell, Goldstein, Frazer & Murphy, Atlanta, GA (Paul K. Rooney, New York City, of Counsel), for Appellant.

Paul J. Hanly, Jr., Colbence & Warner, New York City (Susan J. Kohlmann, Winthrop, Stimson, Putnam & Roberts, New York City, of Counsel), for Appellees.

Before: OAKES, KEARSE, McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

Schlaifer Nance & Co., Inc. ("SNC") is a licensing company that arranges to market famous names or images. SNC sought a licensing agreement with Andy Warhol, the icon of 1960's and 70's pop culture, but Warhol died before they could sign an agreement. Eventually, Warhol's Estate negotiated and signed a broad-based licensing agreement with SNC.

Not long after, SNC sued the Estate in the Southern District of New York for fraud and civil violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, 1962, claiming that many of the works of art that were the subject of the agreement were in the public domain. Judge Stanton (S.D.N.Y.) dismissed the RICO claims, and the fraud claim was assigned to Judge Chin (S.D.N.Y.) for trial. A jury returned a verdict in favor of SNC on the fraud claims, but Judge Chin granted the defendants' Rule 50(b) motions.

A. *Negotiating the Licensing Agreement*

SNC was founded by Roger Schlaifer and Susanne Nance Schlaifer, and both are officers of the company. SNC became very successful in the 1980's after launching a

licensing program for the popular "Cabbage Patch" dolls. Roger Schlaifer met Warhol after SNC commissioned the artist to paint images of the dolls, and they discussed the possibility of licensing Warhol's many works of art. Soon thereafter, Schlaifer hired attorneys David Baker and David Armitage to assist in the negotiation of a licensing agreement with Warhol.

Warhol's business associate, Frederick Hughes, represented Warhol's interests during the negotiations. In December 1985, Schlaifer met with Hughes to discuss the licensing possibilities. An SNC memorandum summarizing that meeting notes that Hughes told Schlaifer that Warhol owned "most," not all, of his images.

Although the parties circulated a draft agreement in 1986, negotiations went into limbo when Warhol lost interest. In February 1987, Warhol died suddenly. In his will, Warhol appointed Hughes the executor of his Estate. Soon thereafter, Hughes retained Edward Hayes as counsel to the Estate.

In the Spring of 1987, Schlaifer met with Hughes in New York to renew discussions of a licensing agreement with Warhol's Estate. The talks were positive, and an agreement seemed imminent. At the meeting, Hughes asked Schlaifer if he objected to a friend of Warhol producing a limited edition watch that had Warhol's name and photographs on its face. Schlaifer had no problem with the idea, but added that the watch deal should be of limited scope, and should not interfere with the possibility of a separate SNC watch program. Consequently, in April 1987, the Estate entered an agreement with the North American Watch Company ("NAW") to allow NAW to produce a limited edition watch. The Estate also agreed that it would not permit another watch program for five years. The Estate did not divulge the details of the deal to SNC, and, indeed in November 1987, Hughes told Schlaifer that there was no watch deal.

Schlaifer, Hayes and Hughes continued the negotiations throughout the Spring of 1987, and met with representatives of SNC in May. At these meetings, Hayes assured Schlaifer that the Estate was going to halt the production of any infringing items. The group also discussed how royalties would be split between SNC and the Estate. Hughes proposed an even split, stating, "we own all of these rights. We control all of these rights, so we think it is more fair if it is just an even split."

Ultimately, SNC signed a Licensing Agreement with the Estate in the Fall of 1987.

## B. *The Agreement*

The Licensing Agreement ("Agreement") was quite broad, and granted SNC many rights to license Warhol's artworks, name and likeness for items in the fashion, home decorating, gift, toy and entertainment industries. A few provisions of the Licensing Agreement are central to this appeal.

The first provision with which the parties are concerned is § 4(a), which calls for the creation of a list of the Warhol works that are the subject of the Agreement. It provides that:

[i]t is understood and agreed that the List provided as of the date hereof and which is attached hereto as Exhibit D and made a part hereof may not be a complete listing of all of Artist's Existing Artworks. The Estate agrees to use its best efforts and to cooperate with [SNC] to ensure that the List shall become an accurate and complete list as soon as is practicable. Additions of Existing Artworks to the List shall clearly identify those Existing Artworks to which the Estate does not own the Copyrights or otherwise have the right to license to [SNC] free of all rights of any third parties, specifying the nature of the limitation on the Estate's ability to grant the license.

The Agreement defined "Existing Artworks" as those Warhol works known to exist as of November 13, 1987.

Exhibit D (the list) contained a legend which read:

* This list is incomplete.

The Estate agrees to update this list as often as reasonably may be requested by [SNC] in regard to any specific works other than those listed herein which [SNC]

wishes to exploit pursuant to the terms of the agreement. No representation is made that each of these works bears a proper copyright symbol, but the Estate will place such a symbol upon any works sold[,] publicly displayed [or] transferred in the future.

Section 4(c) of the Agreement described a group of Warhol artworks designated "Celebrity Works." These were works where Warhol artistically distorted the likenesses of famous figures. Section 4(c) noted that SNC might have to work with the celebrity or the celebrity's estate to license the image.

Section 9(a), entitled "Representations and Warranties," provided that:

(a) [t]he Estate represents and warrants to [SNC] on a continuing basis during the term of this Agreement that: ... (ii) the Artist is the sole creator and the Estate is the sole owner of the Copyrights (other than the right to exhibit previously sold or loaned Existing Artworks) in the Existing Artworks, although certain elements of the Existing Artworks may involve or incorporate concepts in the public domain; (iii) all Existing Artworks owned by the Estate contain and will contain, prior to publication, appropriate notices regarding the ownership of copyrights therein; (iv) except with respect to Celebrity Works, in which third parties have proprietary rights, and except as noted on Exhibit C, the Estate has and will continue to have the sole and exclusive right to transfer to [SNC] all rights to the Existing Artworks and the Works and the Copyrights, Trademarks and New Trademarks granted hereunder; (v) neither the Existing Artworks, the Trademarks nor the Works infringe the rights of any third parties; (vi) neither the Artist nor the Estate has granted and the Estate will not grant any right, license or privilege for Licensed Products with respect to the Trademarks, New Trademarks, Copyrights, or the Works or any portion thereof to any person or entity other than [SNC]. ... Upon [SNC's] request, the Estate shall affirm the accuracy of the warranties contained herein as they relate to specific Existing Artworks, and the Estate shall provide written notice to

[SNC] of any breach hereof within five (5) days of acquiring knowledge of any such breach.

Exhibit C was to contain a list of licenses that had been granted to third parties before the Agreement with SNC. However, Exhibit C was a piece of paper that read "NONE."

Section 9(a) also provided a savings clause for any "inadvertent breach":

An inadvertent breach by the Estate of the warranties contained in subsections (ii) and (iii) of this Section 9(a) shall not be deemed a material breach of this Agreement so long as the Estate, immediately upon receipt of a written notice from the Company identifying a breach of warranty, undertakes in good faith and at no expense to [SNC] such actions as shall be necessary to establish its rights as warranted to [SNC] and diligently prosecutes the same to a successful conclusion.

### C. *After the Agreement is Signed*

On November 23, 1987, after the parties signed the Agreement, SNC received an opinion letter, suspiciously dated October 27, 1987 (before the Agreement was executed), signed by a law firm claiming to represent the Estate. The opinion letter stated that the firm represented the executor of the Estate during the negotiation and execution of the Agreement. The letter continued that the firm had examined relevant documents and had concluded that the "Estate possesses all right, title, and interest in the Existing Artworks necessary to enable it to perform under the Agreement." Trial testimony revealed that the firm had misrepresented its position as counsel to the Estate, and that it had never even reviewed the documents necessary to reach the conclusion that the Estate controlled all rights to the Existing Artworks.

Soon after SNC entered the Agreement, the Estate began to disclose numerous problems regarding control over the rights to Warhol's works.

First, in early 1988, the Estate gave SNC a copy of the NAW watch agreement, revealing its exclusivity provision. Then, a month later, Fotofolio, a publisher of posters and

postcards, surfaced to inform SNC ("at the suggestion of [Hughes]") that it was interested in becoming a sublicensee. Fotofolio explained that it had published some of Warhol's works in collaboration with Ronald Feldman, an art dealer who had commissioned works from Warhol in the past. On January 19, 1988, the Estate wrote to SNC to inform it that Feldman claimed to have reproduction rights to the Warhol images he had published. The letter also explained that certain other works were likely in the public domain. In March 1988, the Estate sent to SNC copies of the agreements between Feldman and Warhol.

Infuriated by this sudden cascade of outside interests, SNC filed a complaint against the Estate in the Southern District of New York, alleging fraud and breach of the Licensing Agreement. SNC complained that for its licensing program to work effectively, it had to acquire the *exclusive* rights to all of Warhol's artworks. Without exclusivity, SNC reasons, a manufacturer would have no reason to come to SNC for a sublicense. SNC alleged that the Estate misled SNC by misrepresenting that it had exclusive control of Warhol's assets, and by not explaining that many of Warhol's works had fallen into the public domain.

An arbitration clause in the Agreement required that some of the claims be arbitrated. SNC therefore went to arbitration and was awarded $4 million in actual and punitive damages for the Estate's misconduct *after* the execution of the Agreement. SNC then amended its pending complaint in federal court to add Hayes, Hughes, and one of Hughes's assistants, Vincent Fremont, as defendants. SNC also added a civil RICO claim against the Estate and the individual defendants.

The Defendants moved to dismiss the RICO claims under Federal Rule of Civil Procedure 12(b)(6), and Judge Stanton granted the motions. There remained only the fraud claim, which was assigned to Judge Chin for trial. At trial, SNC sought to recover its *pre-contract* damages, totaling $280,000. Judge Chin ruled that recovery of actual damages would be limited to $63,941. The jury unanimously found that the Estate,

Hughes and Hayes each knowingly and maliciously defrauded SNC, and awarded SNC compensatory and punitive damages totaling $1,063,941.

The Estate and the individual defendants moved to set aside the verdict and for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Judge Chin granted the motions, concluding that, accepting the testimony of SNC's own witnesses, SNC's own documents, and the language of the Agreement, no reasonable juror could conclude that SNC reasonably relied on the Estate's representations that it controlled all of Warhol's works. Judge Chin also ruled that even if a reasonable juror could have so found, nevertheless the jury award of punitive damages should be set aside because SNC had failed to show the moral culpability necessary to sustain a punitive award.

## DISCUSSION

### I. *The RICO Claims*

SNC complained that the Estate violated civil RICO by engaging in a pattern of racketeering activity, i.e., repeatedly defrauding SNC to maximize the value of the Estate. Assuming SNC proved that the Estate engaged in predicate acts of fraud, its claim for a violation of civil RICO still fails.

SNC claims that the following schemes constitute a pattern of activity violative of RICO:

Scheme A: defrauding the Estate and transporting artwork outside the state;

Scheme B: deceptively making redundant sales of the same rights secured in the Agreement;

Scheme C: fraudulently transferring SNC's rights under the Agreement to others;

Scheme D: accepting advance payments from sublicensees knowing SNC would not approve;

Scheme E: calling SNC to enlist sublicensees, knowing SNC would not approve;

Scheme F: fabricating bases for the disapproval of the licensing of many products;

Scheme G: threatening to allege a known false claim of fraud against SNC;

Scheme H: fraudulently denying receipt of payment for use of one of Warhol's works to try to escape liability to pay co-owner of copyright;

Scheme I: revising history through misrepresentation, deceit, and perjury, to cover up a pattern of racketeering activity.

SNC claimed that all of these schemes had a common thread: the maximization of the wealth of the Estate and the personal wealth of the individual defendants.

Judge Stanton ruled that: (1) schemes A and H were not related to the other schemes; (2) the goal of Scheme B—to have SNC enter a Licensing Agreement—is inconsistent with the goal of schemes C through G and I—which effectively sought to force SNC out of the Agreement; and (3) Schemes C through G and I did not exhibit the continuity necessary to a RICO pattern. Judge Stanton described the acts surrounding Schemes C through G and I as "closed-ended acts involving a single contract, with the common goal of evading [the Estate's] licensing obligations."

A. *Relationship of the Predicate Acts A, B & H*

■ To show a RICO violation, the plaintiff must plead at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989). Predicate acts are "related" for RICO purposes when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901 (internal quotation marks omitted).

■ Judge Stanton correctly held that Schemes A and H were not sufficiently related to the enterprise to comprise part of a pattern of racketeering activity. Schemes A and H are unrelated to the underlying enter-

prise—which is the fraudulent manipulation of the Licensing Agreement. Moreover, Scheme B is not sufficiently related to Schemes C though G and I because the goal of Scheme B is at odds with the goal of the racketeering activity outlined in Scheme C through G and I. The goal of Scheme B was to induce SNC into the contract, while the goal of the other schemes was to force SNC out of the agreement. These inconsistent allegations of fraud cannot be the basis for a RICO claim. Only schemes C through G and I are sufficiently related to support a RICO claim.

B. *Continuity of Predicate Acts C through G and I*

■ These remaining schemes, however, were not sufficiently continuous to form the basis of a RICO conspiracy.

■■ "[A] plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.,* past criminal conduct 'extending over a substantial period of time')." *GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996). To determine whether a threat of "open-ended" continuity exists, a court must examine the nature of either: (1) the predicate acts alleged; or (2) the enterprise at whose behest the predicate acts were performed. *See United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995). This court has held that a matter of years is sufficient to show a "substantial period of time" for closed-ended continuity. *See Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989).

There was no open-ended continuity here. There was no threat that the alleged fraud involved in the execution of the Agreement would continue in the future. Whether there was closed-ended continuity is a more difficult question. Judge Stanton ruled that the allegedly fraudulent acts, although they spanned over three years, were not continuous for RICO purposes because they were acts related to a single contract and single

scheme to defraud. At first glance, Judge Stanton's reasoning might seem flawed given this Court's clear holding that Congress did not mean "to exclude from the reach of RICO multiple acts of racketeering simply because ... they further but a single scheme." *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (en banc). However, courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO. *See id.* Here, that is exactly what SNC is attempting to do. There is one purportedly fraudulent act: the negotiation of the Agreement. The acts complained of in schemes C through G and I are subparts of the singular act, and not a "pattern" of separate acts with an underlying purpose. Consequently, there is no closed-ended continuity.

Accordingly, we affirm Judge Stanton's dismissal of the RICO claim. Even if there were actionable fraudulent activity, the fraudulent acts were either not sufficiently related or continuous to sustain a RICO conspiracy claim. We next turn to consider whether there was any actionable fraud.

## II. *The Fraud Claim*

### A. *The Standard of Review*

■ We review a district court's grant of a motion for judgment as a matter of law *de novo* and we view the evidence in a light most favorable to the non-movant, granting that party every reasonable inference that the jury might have drawn in its favor. *See Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 111–12 (2d Cir.1996), *cert. denied*, ––– U.S. ––––, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). We will set aside a jury's verdict and award judgment as a matter of law only when " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.' " *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993) (citing *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

### B. *Reasonable Reliance*

The over-arching question before Judge Chin was whether a reasonable jury could conclude that SNC reasonably relied on the various misrepresentations by the Estate.

■ Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980).

■ The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive. Circumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations, but rather must "make additional inquiry to determine their accuracy." *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir.1994). Put another way, if the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Mallis*, 615 F.2d at 80–81 (applying New York law).

The parties involved in this litigation are not widows or orphans. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984).

### C. *Was SNC's Reliance Reasonable?*

■ There is little question that the Estate misrepresented its position—it assured

SNC that it controlled all rights to Warhol's works when that was clearly not the case. In addition, SNC argues that the Estate purposefully omitted any mention of public domain problems in an effort to deceive SNC and fraudulently induce it into the Agreement. For the purpose of this analysis we will accept SNC's assertion that the Estate failed to reveal copyright problems in order to deceive SNC. Nevertheless, it was unreasonable for SNC, a sophisticated licensing concern, to rely on these misrepresentations or material omissions. The Estate's actions, the Agreement, and other circumstances should have raised more than one eyebrow, compelling SNC's officers or employees to investigate the extent of the Estate's control over Warhol's works.

Throughout the trial, SNC maintained that it did not know that many of Warhol's works lacked copyright protection. The testimony and documentary evidence, however, paint a different tableau.

In December 1985, well before Warhol died, Hughes informed SNC that the artist "owns copyrights on most of his images," but not all. Indeed, when SNC negotiated an agreement with Warhol in 1986, the draft provided that the final agreement would contain a list of Warhol's artworks to which he did not own the copyright. From the outset, SNC had notice that Warhol did not control all the rights to his known works of art.

These red flags continued to fly after Warhol's death. For example, Ricarda Heising, one of SNC's attorneys, admitted in her deposition that, when she was drafting the Agreement between the Estate and SNC in 1987, she "expected" that Warhol did not own the copyrights to all of his art because of the "sheer magnitude of . . . the body of his works." The implication was that Warhol was so prolific, it would have been difficult to imagine that all of his works remained out of the public domain. She also testified that it would have been unlikely that Warhol owned the copyrights to many of his works because he spent a significant portion of his career as a commercial artist. As a commercial artist, Heising explained, Warhol often sold to his clients the rights to a commissioned work, thereby surrendering the copyright. And it is well established that commercial artists' work is often made for hire, the rights to which rest in the employer or other person for whom the work is prepared. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549 (2d Cir.1995)

SNC also hired Peter Mack, an attorney specializing in copyrights, who discussed the copyright problems with Armitage (one of SNC's lawyers) on October 15, 1987. Armitage wrote in his notes of that conversation that "if multiple prints [were] out there in public, no copyright protection exists, [and the prints would be] in the public domain." The only reasonable implication to be drawn from these notes is that Armitage knew that if Warhol prints had been issued without any copyright notice, then it was likely that the artwork would have no copyright protection.

Mack testified at trial that he actually cautioned SNC to pursue an independent investigation of potential public domain problems. He explained to SNC that, while searching the files of the government's Copyright Office might uncover some problems, the most efficient and thorough way of determining the ownership of the copyrights was through an examination of the documents maintained by the Estate. Such information, he explained, "would have been in the special knowledge of the Andy Warhol business representatives." Only a week after this conversation with Mack, Steven Hayes, an attorney and brother of Edward Hayes who represented the Estate during the negotiation of the Agreement, told Armitage that the Estate maintained multiple files on Warhol's artwork.

A clear message was emerging: exclusive ownership of copyrights to all of Warhol's known artwork was an impossibility. Not only the SNC lawyers, but the Schlaifers themselves, were aware of the copyright problems. During a telephone call with counsel on October 16, 1987, Susanne Nance Schlaifer jotted a note that there were "potentially lots of problems if [Andy Warhol] didn't © or at least put © notice on works." Despite her concerns, neither she nor any employee of SNC asked to see the Estate's files regarding Warhol's artworks.

Her husband, Roger Schlaifer, acknowledged at trial that he had testified in another lawsuit in the Southern District of New York in April 1988. In that testimony, he explained that before he signed the Agreement, he read Exhibit D of the Agreement and "noticed that a number [of the artworks] were not copyrighted." Even a cursory review of Exhibit D illustrates that while many of Warhol's works bore copyright notices such as "© Andy Warhol" and "© Andy Warhol Enterprises, Inc.," other works had copyright notices showing ownership by others, and many contained no copyright notices at all.

As Roger Schlaifer indicated, the Agreement itself provided notice of copyright problems. SNC contends that the Agreement reiterated the Estate's unequivocal (and fraudulent) guarantee that it maintained exclusive control over Warhol's known assets. When read closely, however, the warranties do not provide the blanket of protection that SNC desires.

The Agreement set forth rather broad assurances that the Estate held the rights to all of Warhol's "Existing Artworks," and defined that term to mean all works known to exist when the Agreement was signed. The Estate did not guarantee control over *all* artworks, but simply those known to *"[e]xist"* at the inception of the Agreement. Hence, the Agreement makes clear that there was a spectrum of artworks about which the Estate and SNC had no information—artworks that could easily lack copyright protection.

Section 4(a), in turn, sounds the second klaxon that the Estate could not guarantee exclusive control over Warhol's assets. It stated expressly that Exhibit D *"may not be a complete listing"* of Warhol's artwork known to exist as of the signing of the Agreement. It also indicated that any future additions to Exhibit D would indicate whether the Estate owned the Copyright. The only reasonable inferences one can draw from this language are that: (1) there may have been pieces of artwork which were known to exist but had not been included in the Exhibit; (2) that the Estate may or may not have controlled the rights to these pieces of art; (3)

that there were artworks that may be discovered at some point in the future; (4) and that the Estate did not know whether it controlled the rights to these undiscovered works.

Exhibit D itself reinforced the message that the Estate could not guarantee exclusivity of control over copyrights to all of Warhol's artwork. The legend to Exhibit D expressly stated that *"[n]o representation is made that each of these works bears a proper copyright symbol."* If the Estate could not guarantee that every existing piece bore a copyright symbol, then it was likely that some of Warhol's known works could fall into the public domain, if they had not done so already.

The language of the Agreement undercuts SNC's theory that the Estate guaranteed exclusive control of the rights to all of Warhol's known works. SNC argues, however, that the warranties of Section 9(a) should be given a strict construction, that the warranties guaranteed exclusive control over every Warhol work, and that a reasonable juror could have concluded that SNC relied on the warranties to its detriment. The Section 9(a) warranties, however, merely guarantee the Estate's exclusive control over Existing Artworks.

When the 9(a) warranties are read in conjunction with the legend of Exhibit D, it is clear that the Estate warranted control only over the rights to works listed in Exhibit D that *actually had Andy Warhol Copyrights*. To read the warranty as strictly as SNC proposes is contrary to the well-established principles of contract interpretation, which require that all provisions of a contract be read together as a harmonious whole, if possible. *See, e.g., Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir. 1994) (citing *Enercomp, Inc. v. McCorhill Publ'g,* 873 F.2d 536, 549 (2d Cir.1989) (rejecting appellants' construction of contract as "somewhat at odds with the agreement as a whole"); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985); Restatement (Second) of Contracts § 202(2) (1981)). To read the warranties as SNC asks would require us to hold that, while the contract specifically notes that the Estate (1)

could not possibly control the copyrights on certain works (i.e., those Existing Artworks with copyrights owned by others as noted on Exhibit D), (2) did not know if other works existed at all, and (3) if they did exist, whether they bore Warhol copyrights, that the Estate still guaranteed that it owned the rights to all of these images. This we cannot do.

Finally, the Agreement contains an inadvertent breach provision, which Armitage and Steven Hayes discussed on October 22, 1987. Armitage's notes of that conversation reveal that the two discussed the breadth of the Section 9(a) warranties. Armitage wrote that SNC wanted the Estate to say "here is everything[and that the Estate had] no knowledge of claims [to copyrights]." He noted, however, that the Estate could not make such guarantees because there was "no one set of files on artwork" and no one would be able to "go back and review each." To solve this problem, the two settled on the inadvertent breach provision, to ensure that any copyright problem revealed after the signing of the Agreement would not be deemed a material breach of the warranties as long as the Estate acted in good faith. Both Armitage and Steven Hayes knew that there were so many artworks, and so many files, that it was impossible to guarantee exclusive copyright ownership.

The testimony of SNC lawyers, the documentary evidence, the Agreement, and the notes of the attorneys negotiating the Agreement raise numerous questions regarding the ownership of Warhol copyrights. All these questions, as a matter of law, illustrate that it was unreasonable for SNC to rely on the Estate's representations that it owned all rights to every Warhol work. Judge Chin did not err by ruling that no rational juror could have concluded that SNC reasonably relied on the Estate's misrepresentations.

1. *The Watch Deal*

█ The NAW Watch Deal deserves separate comment. While Hughes asked for Schlaifer's views on the possibility of a watch program, the Estate never provided SNC with the details of the NAW deal, and, in November 1987, Hughes actually denied to Schlaifer that there was any watch deal. In addition, in the Agreement, the Estate warranted that it had not granted a license for any Warhol assets to any third party. Admittedly, the Estate misled SNC by stating that there was no watch deal, and that it had not granted a license to any third parties— the rub is whether SNC reasonably relied on these misleading statements.

█ SNC was a sophisticated, successful marketing operation. Generally, sophisticated businessmen's reliance on the misrepresentations of a party is *un*reasonable when the businessmen are "engaged · in major transactions [with] access to critical information [and] fail to take advantage of that access." *See Grumman,* 748 F.2d at 737. As outlined in section 1, SNC had full and complete notice of significant problems with the Estate's promise of exclusive ownership of all of Warhol's assets. This notice should have placed SNC, a company with a developed business acumen, on guard, and compelled SNC to review the Estate's files. SNC's attorneys and officers knew of the problems, and representatives of the Estate told SNC there were multiple files on Warhol's works. A lawyerly review of these files would have uncovered the NAW watch agreement. Although the Estate lied to SNC about this one particular aspect of Warhol's collection of assets, SNC could not reasonably rely on this misrepresentation when SNC was fully aware that there were serious problems regarding the entire Estate—notice that would have led any reasonably diligent attorney or corporate officer to investigate the serious questions that arose during negotiation of the Agreement.

2. *The Opinion Letter*

█ SNC also maintains that it relied on the assurances in the opinion letter. The opinion letter guaranteed that the Estate controlled "all right, title, and interest in the Existing Artworks" necessary to perform the Agreement. The letter was indeed misleading—the law firm that wrote the letter did not represent the Estate and had not reviewed the documents necessary to make such assurances. Again, however, the question is whether a rational juror could have

concluded that SNC reasonably relied on the letter.

As Judge Chin pointed out, SNC *did not* receive the opinion letter until *after* the Agreement was executed. "Moreover," Judge Chin correctly noted, "the opinion letter was defective on its face ... [in that] it [was] dated prior to the date of execution of the Agreement." SNC argues to us that the Agreement was not complete until the opinion letter was received. But there is no indication that the Agreement was contingent upon the receipt of an opinion letter. No rational juror could have concluded that SNC reasonably relied on an opinion letter, received well after the execution of the Agreement, in entering the Agreement.

Accordingly, Judge Chin's grant of the defendants' motions for judgment as a matter of law under Federal Rule of Civil Procedure Rule 50(b) is affirmed.

### CONCLUSION

Judge Chin's grant of the defendants' Rule 50(b) motions is affirmed, as is Judge Stanton's dismissal of SNC's civil RICO claims.