**FRESH MEADOW FOOD SERVICES, LLC and Thomas J. Clarke, Plaintiffs–Appellants,**

v.

**RB 175 CORP., Raphy Benaim, Tovit Benaim, Defendants–Appellees.**

**Nos. 06–4905–CV(L), 07–0269–CV(CON).**

United States Court of Appeals, Second Circuit.

June 24, 2008.

Martin William Scherer, Siller Wilk LLP, New York, NY, for Plaintiffs–Appellants.

Jonathan H. Freiberger, Gleich, Siegel & Farkas, Great Neck, NY, for Defendants–Appellees.

PRESENT: Hon. SONIA SOTOMAYOR, Hon. REENA RAGGI, Circuit Judges, Hon. JOHN GLEESON, District Judge.*

### SUMMARY ORDER

Plaintiffs-appellants Fresh Meadow Food Services, LLC and Thomas J. Clarke appeal from the September 25, 2006 judgment of the United States District Court for the Eastern District of New York (Gershon, J.), granting the motion of defendants-appellees RB 175 Corp., Raphy Benaim and Tovit Benaim to dismiss plaintiffs' RICO claim.[1] As the RICO claim was the only federal claim in the Amended Complaint, the district court declined to exercise supplemental jurisdiction over the remaining claims and dismissed them without prejudice. The central issue on appeal is whether plaintiffs' civil RICO cause of action sufficiently alleged the continuity (or threat thereof) necessary for the alleged racketeering acts to form a "pattern of racketeering activity." Be-

cause we conclude that it did, we therefore reverse and remand for further proceedings.

## BACKGROUND

The following facts are presented in the Amended Complaint or in documents that, although not attached to the complaint, are integral to it. *See Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565–66 (2d Cir. 2006), *aff'd*, 552 U.S. ——, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008).

On August 26, 1988, defendants Raphy Benaim and his wife, Tovit Benaim, purchased real property at 175–14 Horace Harding Expressway in Fresh Meadows, New York (the "Property"). During the 20–year period preceding the purchase, a gas station was operated on the Property by Raphy or others to whom he had subleased it. Also, for a brief period not long before the purchase, Raphy had subleased the Property to an oil change and lube business (the "Quick Lube business").

After the purchase, Raphy discovered that the gas station was operating illegally because a zoning variance issued in 1931 had expired. In 1991, he applied to the New York City Board of Standards and Appeals to renew the variance. The approval process required Raphy to appear before a Community Board to answer questions regarding the Property. The Board members questioned him about the removal of four gas pumps as well as about the presence of any underground storage tanks ("USTs") on the premises. Plaintiffs allege that in his effort to get the

---

* The Honorable John Gleeson, District Judge, of the United States District Court for the Eastern District of New York, sitting by designation.

1. Because the defendants had already answered the Amended Complaint, the district court converted the motion into one for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The standard for the motions is the same. *See Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999) ("In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6)....").

Community Board's approval of his application to renew the variance, Raphy falsely told the board that the Quick Lube business had removed the USTs from the Property under the supervision of the fire department.

In 1997, Raphy retained Camin Cargo Control, Inc. ("Camin") to prepare a "Tank Closure Report" as part of his effort to attract an oil company to open a gas station on the Property. Plaintiffs allege that Raphy, knowing there were USTs on the Property, the presence of which would prohibit the issuance of the Tank Closure Report, did two things. First, on August 8, 1997, he faxed to Camin a one-page affidavit, purportedly from Trinity Petroleum Systems. The affidavit, which Raphy allegedly fabricated, stated that "on November 7, 1989 Trinity Petroleum Systems, Inc . . . . removed eleven (11) underground storage tanks from the above listed location." J.A. 48.[2] Second, when Camin sought soil samples, Raphy made sure the drilling occurred on the wrong parts of the Property by claiming that underground facilities prohibited drilling where the USTs were located. These tactics succeeded; Camin's Tank Closure Report asserted that the USTs had been pumped empty by Trinity Petroleum Systems; that the interior and exterior of the tanks had been visually inspected; and that there was no sign of any structural damage to the tanks. The report also asserted that all of the tanks had been removed to the salvage yard for disposal and there was no evidence they had caused any soil contamination.

In 2000, Raphy offered the Property to plaintiff Thomas Clarke for lease. Clarke was intending to demolish the existing building and construct a fast food restaurant. Aware that the Property had been home to a gas station, Clarke asked Raphy for information concerning the environmental condition of the property. Raphy represented that the USTs had been removed and there was no soil contamination, and he provided the Camin Tank Closure Report to Clarke. The parties negotiated a lease of the Property, and drafts of the lease were sent by Clarke's attorney via the United Parcel Service on January 26 and 30, 2001. On March 21, 2001, the lease was executed by Clarke, Raphy and Tovit. In reliance on the Tank Closure Report and Raphy's representations, Clarke agreed to a limitation on the Benaims' liability in the event excavation of the Property revealed environmental contamination. Specifically, their liability was limited to the lesser of $100,000 or the amount needed to remediate the Property. Clarke now claims that Raphy fraudulently induced him to enter into the lease.

Clarke excavated the Property to build the fast food restaurant and discovered six 550–gallon USTs and one 4,000 gallon UST. They were located in the place from which the fraudulent Tank Closure Report said they had been removed. Clarke uncovered significant soil contamination as well. He and his assignee, Fresh Meadow, spent in excess of $160,000 removing the USTs and the contaminated soil. As provided for in the lease, they received a $100,000 credit toward the remediation.

In 2004, Raphy gave testimony at a deposition in connection with a state court action he brought against the plaintiffs in this case. Contrary to the statements he made to the Community Board years earlier, Raphy testified that he personally, not the Quick Lube business, had retained

---

**2.** In their complaint, plaintiffs state that the Trinity affidavit was provided to Camin via facsimile on August 8, 1993. This appears to be a typographical error. The facsimile is dated August 8, 1997.

Trinity Petroleum to remove the USTs from the Property, and that he personally had observed the removal of the USTs.

The District Court granted defendants' motion on the ground that plaintiffs' RICO claim failed to adequately allege a pattern of racketeering activity because the acts of racketeering activity did not amount to or pose a threat of continued criminal activity.

## DISCUSSION

"We review *de novo* a district court's dismissal of a suit pursuant to a motion for judgment on the pleadings." *Desiano v. Warner–Lambert & Co.*, 467 F.3d 85, 89 (2d Cir.2006). As noted above, such motions are decided by the same standard that applies to motions to dismiss pursuant to Rule 12(b)(6). The motions test the legal, not the factual, sufficiency of a complaint. *See, e.g., Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))). Accordingly, we must accept the factual allegations in the complaint as true. *See Erickson v. Pardus*, — U.S. —, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam). Where, as here, a RICO claim's predicate acts include allegations of fraud, the circumstances constituting the alleged fraud must be pled with particularity. Fed.R.Civ.P. 9(b); *Moore v. Paine-Webber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999).

The Amended Complaint alleges that the defendants violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." The statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "'pattern of racketeering activity' requires at least two acts of racketeering activity," § 1961(5), and the Supreme Court has held that it further requires that those acts be related to one another and amount to or pose a threat of continued criminal activity. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "Racketeering activity" includes any act indictable under 18 U.S.C. §§ 1341 or 1343, the mail and wire fraud statutes, respectively. A private right of action is available to "[a]ny person injured in his business or property by reason of a violation of section 1962." *Id.* at § 1964(c).

The Amended Complaint alleges an enterprise consisting of a business operated by Raphy, Tovit, and entities "that have owned or leased real property in New York". Am Compl. ¶ 83.[3] Fairly read, it further alleges that the enterprise affected interstate commerce; that Raphy was associated with the charged enterprise; and that he conducted its affairs through a pattern of racketeering activity consisting of one act of wire fraud (the faxing of the fabricated affidavit to Camin in August 1997) and two of mail fraud (the January 2001 mailings of a draft lease to Clarke). Finally, it alleges that plaintiffs were injured in their business or property by reason of Raphy's conduct, in that they

---

**3.** This aspect of the complaint is hardly clear. However, the sufficiency of the enterprise allegations was not challenged in the district court and is not at issue on this appeal.

incurred expenses in having the USTs removed and the Property remediated.

As mentioned, the central issue before us is quite narrow: are the racketeering acts alleged by the plaintiffs—the August 1997 wire fraud and the two acts of mail fraud in January 2001—sufficient to establish a pattern of racketeering activity? RICO's pattern requirement was addressed by the Supreme Court in *H.J.*, which involved civil RICO claims brought by customers of Northwestern Bell Telephone Co. The customers alleged that telephone company officials had bribed members of the Minnesota Public Utility Commission on multiple occasions over a six-year period to induce the Commission to approve excessive rates. The Eighth Circuit had affirmed the dismissal of the RICO charges pursuant to Rule 12(b)(6) on the ground that racketeering acts committed as part of a single fraudulent scheme could not constitute a pattern; rather, a RICO plaintiff was required to allege and prove multiple schemes. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 829 F.2d 648 (8th Cir.1987), *rev'd*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

The Supreme Court reversed in a decision that shed further light on the pattern requirement. The statutory "definition" in § 1961(5), it observed, "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J.*, 492 U.S. at 237, 109 S.Ct. 2893. In identifying the features of a pattern in addition to the required racketeering acts specified by the statute, the Court drew upon legislative history indicating that "sporadic activity," or "two widely separated and isolated criminal offenses," is not enough. *Id.* at 239, 109 S.Ct. 2893. What is required is that the acts be "related, *and* that they amount to or pose a threat of continuing criminal activity." *Id.*

Borrowing from the dangerous special offender sentencing provisions in the statute that also included the RICO laws, the Court held that acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893 (quoting 18 U.S.C. § 3575(e) (repealed 1984)).

As for continuity or the threat of continuity, the Court first rejected the Eighth Circuit's "multiple scheme" requirement. "[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." *Id.* Such an approach not only imposes unwarranted rigidity, but "it does so ... by introducing a concept—the 'scheme'—that appears nowhere in the language or legislative history of the Act." *Id.* at 240–41, 109 S.Ct. 2893. Adopting a "less inflexible approach," the Court held that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter*," and it set forth two means doing so. *Id.* at 241, 109 S.Ct. 2893.

The prosecution may prove a "closed period of repeated conduct," which entails proof of "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* *H.J.* left the precise contours of the continuity requirement to further development, and this Court has provided some. As we have repeatedly observed, we have "never found a closed-ended pattern where the predicate acts spanned fewer than two years." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir.2004); *see also Cofacredit v. Windsor*

*Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999); *GICC Capital Corp. v. Tech. Fin. Group, Inc.,* 67 F.3d 463, 467 (2d Cir.1995). We have further held that just because "multiple schemes are not required in all circumstances does not mean that the number and nature of the schemes alleged by a plaintiff in a given case are entirely irrelevant. Rather, a plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.'" *GICC,* 67 F.3d at 467. In *GICC* we identified some "non-dispositive factors" courts have considered in determining whether closed-ended continuity exists, "including, *inter alia,* the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *Id.*

"Open-ended" continuity, the second means of satisfying the continuity requirement, entails proving the *threat* of long-term criminal conduct. A fact-specific inquiry, open-ended continuity may inhere in racketeering acts themselves, as in a gangster's demand for regular "protection" money, or in the fact that the acts are part of an ongoing entity's regular course of business. *See H.J.,* 492 U.S. at 242–43, 109 S.Ct. 2893. And open-ended continuity "is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business …, or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243, 109 S.Ct. 2893.

Applying these principles to this case, the requisite relationship between the alleged racketeering acts is clear: both were committed as part of an ongoing scheme by Raphy to fraudulently misrepresent the environmental condition of the Property to his commercial advantage. However, the district court concluded that although "plaintiffs allege two predicate acts, several years apart, these allegations are insufficient to establish a closed-ended pattern of racketeering activity." *Fresh Meadows Food Services, LLC v. RB 175 Corp.,* No. 04–CV–4767 (NG)(RLM), 2006 WL 2728935, at *6 (E.D.N.Y. Sept. 25, 2006). Applying the *GICC* factors discussed above, the court observed that there was not "a great number or variety of predicate acts," no "separate schemes" and, in essence, but a single participant (Raphy) and a single victim (Clarke). *Id.*

Our precedent compels a different conclusion. Whether closed-ended or open-ended, continuity is "centrally a temporal concept." *H.J.,* 492 U.S. at 242, 109 S.Ct. 2893. Although *GICC* identified several "non-dispositive factors" that courts must consider in assessing whether closed-ended continuity has been established, 67 F.3d at 467, those factors are more significant in cases where the period of time over which the alleged racketeering acts borders on "substantial." Where the racketeering acts span nearly three and one-half years, as they do here, the presence or absence of the other factors is less critical. In any event, application of the *GICC* factors to this case does not support dismissal. Raphy's alleged pattern of racketeering activity was not directed solely at plaintiffs. Rather, the allegedly fabricated affidavit underlying the 1997 wire fraud predicate was integral to an alleged scheme to defraud *any* potential purchaser or lessee of the Property by concealing the potentially hazardous USTs. Moreover, that alleged fraud was perpetrated against Camin, who prepared the tank closure report. And because that is the same harm allegedly inflicted by the fraudulent inducement of Clarke into executing the lease, plaintiffs' allegations, which must be accepted as true, preclude a determination as a matter of law that the predicate acts

constitute only isolated, sporadic criminal activity.

Lastly on the subject of closed-ended continuity, this case does not resemble *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir.1997). In that case the alleged fraud spanned three years, yet we held that closed-ended continuity was not established. *Id.* at 97–98. But plaintiffs in that case had "artificially fragment[ed] a singular act [*i.e.*, the negotiation of a licensing agreement] into multiple acts simply to invoke RICO." *Id.* at 98. The alleged pattern here does not suffer from such a defect. Its predicate acts bear the same relationship to Raphy's alleged fraudulent plan to maximize the value of his property, but they arise out of distinct events—the faxing of the fabricated affidavit to Camin in 1997 and the fraudulent inducement of Clarke to execute the lease in 2001.

To the extent defendants further insist that the complaint fails to plead open-ended continuity because the alleged pattern was necessarily terminated by the excavation of the remaining USTs by plaintiffs and the remediation of the Property, we cannot reach that conclusion as a matter of law. A landowner's responsibility for environmental hazards on his property does not necessarily end when those hazards are removed. The recent order issued by the New York State Department of Environmental Conservation, of which this Court took judicial notice on March 7, 2008, illustrates as much. Plaintiffs claim that Raphy continued his fraudulent scheme to avoid responsibility for the USTs by asserting in that proceeding there were actually two sets of USTs on the Property, one removed shortly before he purchased the land, the other mysteriously buried without his knowledge at a later date. Whether this or any of the plaintiffs' other allegations can be proved must await further proceedings below. The only issue before us is whether plaintiffs are entitled to an opportunity to prove that Raphy's alleged fraudulent acts with respect to the Property were "a regular way of conducting defendant's ongoing legitimate business." *Id.* at 243, 109 S.Ct. 2893. We hold that they are entitled to that opportunity.

Defendants contend that "if a RICO claim [is] established by the facts set forth in the Amended Complaint[,] every breach of contract claim where fraud is alleged would give rise to a Federal Court action sounding in RICO." Brief for Appellees at 12. We think otherwise, and the cases cited and distinguished above, *see, e.g., First Capital,* 385 F.3d 159, expose defendants' overstatement. Still, there is no question that RICO's private right of action, in conjunction with the statute's inclusion of mail and wire fraud (for which there is no independent private right of action) as racketeering acts, creates federal treble damage actions out of business disputes that would otherwise never be in federal court. However, the Supreme Court long ago observed that "this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

Finally, our decision moots plaintiffs' claim that the district court erred by denying their post-judgment motion seeking, *inter alia,* leave to file a supplemental complaint. Our judgment will reinstate the Amended Complaint; any application to further amend that pleading on remand shall be determined by the district court pursuant to Fed.R.Civ.P. 15(a).

## CONCLUSION

Accordingly, the judgment of the district court is VACATED and the case is RE-MANDED to the District Court for further proceedings consistent with this decision.